N THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PRESTON PETERSON | CIVIL DIVISION |
| Plaintiff, | Civil Action No. 2:23-cv-446 |
| MUNICIPALITY OF PENN HILLS POLICE DEPARTMENT; *Individual Defendants* ANTHONY DIULIUS; JOSEPH SNYDER; MATTHEW JUNOD | **JURY TRIAL DEMANDED** |
| Defendants. | |

### COMPLAINT[1]

Plaintiff, Preston Peterson ("Mr. Peterson"), by and through his undersigned counsel, The Lacy Employment Law Firm LLC, hereby files this Complaint against Defendants and states as follows:

### PARTIES

1. Preston Peterson is an Black male patrolman in the Municipality of Penn Hills Police Department (the "Department").

2. The Municipality of Penn Hills Police Department is located at 102 Duff Road, Pittsburgh, PA 15235

3. Lt. Diullius was, at all relevant times, a Patrol Commander with the Department. He is a White male.

4. Lt. Snyder was, at all relevant times, a Patrol Commander with the Department. He is a White male.

---

[1] Plaintiff's TItle VII and PHRA claims are still pending with the EEOC. Plaintiff will move to amend and add those claims when they are ripe.

5. Sgt. Matthew Junod was a Shift Commander at the Department. He is a White male.

## FACTUAL BACKGROUND

6. Mr. Peterson was targeted for multiple write ups for being out of his area and driving to a different municipality.

7. Other officers never listened to the directive that they were to stay in their assigned area from the lieutenant.

8. Other, white officers, would drive to and through areas outside of the municipality in an effort to garner additional miles for their vehicle or even to back up another officer when that was not requested.

9. Lt. Diubilus wrote Mr. Peterson up for being outside of the area to which Mr. Peterson was assigned.

10. Although other white officers were never reprimanded for such activity, Mr. Peterson was given a write up for falsifying a police document.

11. Officially, Mr. Peterson was written up for falsifying a daily activity log ("DAL").

12. Mr. Peterson was simply eating food at a subway and taking his migraine medication when he was reported for falsifying a DAL.

13. Other white troopers, however, engaged in much more egregious conduct and were never written up.

14. Mr. Peterson was also discriminated against when he responded to a parking complaint.

15. A parking complaint is of low priority and officers tend to wait several minutes before responding to it to give the owner of the vehicle time to return to the vehicle and move it.

16. When Mr. Peterson arrived on scene, he located the car and ran the registration plate. Mr. Peterson then determined that the car was owned by an individual who lived across the street in a converted apartment complex.

17. Where the car was parked, it was marked with a no parking sign. However, as Mr. Peterson had done many times and as he was trained to do, he went to the apartment complex to attempt to locate the owner and tell him to move his vehicle.

18. He knocked on all three apartment doors with no response.

19. Mr. Peterson wrote a warning ticket for the car's owner and cleared the scene.

20. He did not hear about this incident for several days until Sergeant Junod asked him what action he took with the parking complaint.

21. Sergeant Junod told Mr. Peterson to turn in a copy of the ticket and that it was a good thing because he did not have to worry about his boss anymore, and he would leave him alone.

22. Lt. Snyder, several months after this incident, wrote Mr. Peterson up for taking too long to respond to the call.

23. The excuse he gave was that Lt. Snyder watched the car camera and saw Mr. Peterson conducting personal business while on duty.

24. Lt. Snyder, however, did not discipline Sergeant Junod for similar conduct. Sergeant Junod – who was promoted recently – stopped at a local grocery store while on duty without calling county dispatch.

25. Mr. Junod was also accused by a citizen of intentionally flattening the citizen's tires on his vehicle.

26. Mr. Junod's incident made local news. Mr. Junod, however, received no discipline for this incident.

27. In another incident of racial discrimination, Mr. Peterson received a call for individuals walking down a street, peering into cars, and pulling the door handles.

28. Mr. Peterson was working with Sergeant Junod at the time.

29. Two white officers apprehended a Black male – who was a juvenile – at the scene.

30. One of the two officers who arrested the Black male told Mr. Peterson that he inadvertently kicked the suspect in the head.

31. Officer Gus Lukacs, told Mr. Peterson that the suspect asked him which officer hit him in the head.

32. Officer Lukacs told Mr. Peterson he informed the suspect that the "Black guy" hit him in the head.

33. The suspect went to school the next day with a bruise on his head and his teacher asked him how he got the bruise.

34. Several days later, Lt. Diulius interviewed Mr. Peterson about the incident.

35. The suspect told the teacher that the black cop (Mr. Peterson) hit him in the head. The teacher then notified the Child Line of the incident, and requested an investigation into Mr. Peterson for using excessive force.

36. Lt. Diulius never investigated the two arresting officers – Lukacs and Pine – about the incident. Instead, he laughed about the situation.

37. The Department routinely only hired one Black trooper at a time. And often made disparaging comments to whomever was hired.

38. While Mr. Peterson was on military leave, the Chief of the Department, disparaged Mr. Peterson, mockingly asking other troopers if Mr. Peterson was done playing army.

39. In another incident, a White officer told Mr. Peterson that the George Floyd incident was blown out of proportion.

40. He went on to say that the majority of crime (90%) is committed by the Black population against White people. Besides the fact that this is not true, this is insulting to the Black community, especially when this person is tasked with protecting and serving all communities.

41. This officer also propounded conspiracy theories about the media faking the pictures of Mr. Floyd's murder.

42. In a severe incident of racial discrimination, the chief, Howard Burton, sent a text message with a racist joke.

43. The joke read" "What is long and hard on a black person?"  Eighth Grade!"

44. Further displaying racism within the Department, numerous officers criticized President Barack Obama.  Of course, any politician can be the subject of criticism.  But President Obama was criticized for his race.

45. For example, officers in the Department stated that Michelle Obama looked like an animal, is racist, and hates America.

46. Further, comments were made that Black people should not support President Obama because he is not really Black.

47. Mr. Peterson was routinely written up for petty offenses that White officers were not written up for.

48. Mr. Peterson was targeted in the Department.

49. He, again, was the only Black person in the Department during the last three years. Yet he was written up at least eight times for conduct that his White peers would not – and were not – written up for.

50. To further demonstrate, Mr. Peterson was written up for leaving a patrol car idling in the backlot of the station. This was common practice amongst officers. No other officer was written up for this conduct.

51. The Department continued to write Mr. Peterson up for petty violations. This was pretext for discrimination. They continued to write him up for these petty violations until he was terminated.

52. On March 15, 2021, Mr. Peterson was terminated because of his race.

53. Mr. Peterson was replaced by a White male.

## COUNT I (Section 1983)
### Discrimination & Hostile Work Environment

54. Plaintiff hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

55. Defendants' discriminatory and retaliatory actions, as set forth herein, deprived Mr. Peterson of equal protection under the law as guaranteed by the Fourteenth Amendment of the United States Constitution.

56. As a result of Defendants' actions, Defendants have denied Mr. Peterson the right to the same terms, conditions, privileges and benefits of their employment with the Pennsylvania State Police, in violation of 42 U.S.C. § 1983.

57. Defendants' violation of the constitution included policies, practices, and/or customs to treat black employees in the Department less favorably than white employees, which

was committed, directed, implemented, and/or ratified by officials of Defendants or Defendants in supervisory capacities with policymaking and decision-making authority.

58. As a direct and proximate result of Defendants's acts and conduct, which caused and continue to cause Mr. Peterson to be denied equal protection under the law, Mr. Peterson has suffered and will suffer those injuries, damages, and losses alleged herein and has incurred and will incur attorneys' fees.

59. The wrongful acts and conduct of Defendants were done with deliberate indifference to the statutory and constitutional rights of Mr. Peterson.

60. The actions of the Defendants, individually and collectively, all of which were taken under color of law.

61. Mr. Peterson suffered adverse employment consequences, specifically, Defendants retaliated and terminated Mr. Peterson for his race and questioning policies and practices at the Department.

62. The Department's policies and practices – disciplining the only Black trooper for offenses that White troopers are not disciplined – subjects it to liability under Section 1983 as an entity. The Department ratified the policies and practices of the supervisor officers.

63. The Department, by and through its supervisor and policymakers, had contemporaneous knowledge of the incidents of racial discrimination and harassment that Mr. Peterson faced, and the inaction by Department and its supervisors (Defendants) communicated messages of approval to the offending subordinates.

64. Defendants participated in violating Mr. Peterson's rights and/or they directed others to violate them, and/or they had knowledge of and acquiesced in their subordinates' violation(s).

65. This severe and pervasive hostile environment continued throughout Mr. Peterson's employment. He attempted to find relief in the Department's formal EEO procedures and was continually advised by Defendants that the Department would change its policies and practices. The Department never did.

66. Upon information and belief, Defendants were in agreement to not investigate certain complaints of discrimination within the Department. This was an unlawful violation of Mr. Peterson's Fourteenth Amendment right to equal protection in the workplace. The Defendants acted in furtherance of this scheme by quickly investigating other incidents of subordination in the force while deliberately not investigating EEO violations.

67. Mr. Peterson suffered other emotional damages, including a formal diagnosis of PTSD and anxiety. This includes physical manifestations, such as loss of sleep, loss of appetite, loss of intimacy with his partner, loss of time with his children, prolonged period of depression, and an emergency room visit.

**RELIEF**

WHEREFORE, Plaintiff seeks damages and legal and equitable relief in connection with Defendants' improper conduct, and specifically prays that the Court grant the following relief to Plaintiff by:

a) Declaring the acts and practices complained of herein to be in violation of Section 1983;

b) Enjoining and permanently retraining the violations alleged herein;

c) Entering judgment against Defendants and in favor of Plaintiff in an amount to be determined;

d) Awarding compensatory damages to make Plaintiff whole for all lost earnings, earning capacity and benefits, past and future, which Plaintiff has suffered or may suffer as a result of Defendants' improper conduct;

e) Awarding compensatory damages to Plaintiff for past and future pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasure, which Plaintiff has suffered or may suffer as a result of Defendants' improper conduct;

f) Awarding punitive damages to Plaintiff;

g) Awarding Plaintiff such other damages as are appropriate under Title VII, Section 1983, and the PHRA;

h) Awarding Plaintiff the costs of suit, expert fees, other disbursements, and reasonable attorney's fees; and,

i) Granting such other and further relief as this Court may deem just, proper, or equitable including other equitable and injunctive relief providing restitution for past violations and preventing future violations.

j) A jury trial on all triable issues.

                                Respectfully submitted,

Dated: March 15, 2023

                            */s/ Andrew Lacy, Jr.*
                            Andrew Lacy, Jr. Esq.
**THE LACY EMPLOYMENT LAW FIRM LLC**
2514 W Seybert Street
Philadelphia, PA
(t) 412-301-3908
andrew.lacy@employment-labor-law.com

*Counsel for Plaintiff*